JUDGE STEIN

Michael S. Sommer
Jessica L. Margolis
Sheryl Shapiro Bassin
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

"14 CV 8192

and

Lawrence I. Fox, Esq.
250 West 82nd Street
New York, New York 10024
Telephone: (917) 620-2778



RECEIVED
OCT 1 4 2014
U.S.D.C. S.D. N.Y.

*Co-Counsel for Plaintiffs Neopharm Ltd. and Promedico Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEOPHARM LTD. and PROMEDICO LTD., <br><br> Plaintiffs, <br><br> v. <br><br> WYETH-AYERST INTERNATIONAL LLC f/k/a WYETH-AYERST INTERNATIONAL INC., <br><br> Defendant. | Civil Action No. |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Neopharm Ltd. ("Neopharm") and Promedico Ltd. ("Promedico"), by their attorneys Wilson Sonsini Goodrich & Rosati, P.C. and Lawrence I. Fox, bring this action against Defendant Wyeth-Ayerst International LLC ("Wyeth") and allege as follows:

## PRELIMINARY STATEMENT

1. This action seeks redress for Wyeth's abrupt and unlawful termination of Neopharm as the exclusive distributor for numerous important pharmaceutical products in Israel, including cutting-edge, life-saving vaccines. For over 70 years, Neopharm acted as the exclusive distributor of many – and, beginning in 2008, of all – pharmaceutical products for Wyeth and its predecessors in the territory that now comprises Israel. Over the course of their decades-long business relationship, the parties entered into a number of written agreements. The most recent agreement between the parties was the Amended and Restated Distribution Agreement, which became effective on October 1, 2002 and which was amended in part on a number of occasions (collectively with amendments, the "Distribution Agreement").

2. Under the Distribution Agreement, Neopharm was appointed as Wyeth's exclusive distributor of key pharmaceutical and pipeline products in Israel. Included among those products was Prevenar, an important pneumococcal vaccine that, among other things, prevents infants and young children from contracting life-threatening pneumococcal disease and meningitis.

3. Given Neopharm's position as Wyeth's exclusive distributor in Israel for Prevenar, as well as Neopharm's strong reputation and relationships in the territory (including with key government contacts), Wyeth relied on Neopharm to manage and conduct negotiations with the Israeli Ministry of Health (the "Ministry of Health" or "Ministry") to include Prevenar

1

in Israel's National Immunization Program ("NIP") and to secure an exclusive supply agreement with the Ministry.

4.      Following more than a year of negotiations between Neopharm and both the Ministry of Health and Israel's Ministry of Finance, Neopharm prevailed.  On April 5, 2009, Promedico (a wholly-owned subsidiary of Neopharm) and the Ministry of Health entered into an agreement for the exclusive and long-term supply of Prevenar to the Ministry (the "MoH Agreement").  Under the MoH Agreement, Prevenar would be included in Israel's NIP and, consequently, be offered and administered to each and every newborn in Israel as the sole and exclusive vaccine against pneumococcal disease.

5.      Shortly after the MoH Agreement was executed, Wyeth and Neopharm amended the Distribution Agreement.  Among other things, this amendment suspended Wyeth's right to terminate the Distribution Agreement without cause through the later of (a) the period during which the MoH Agreement (including any extensions thereto) remained in effect, or (b) any outstanding orders by the Ministry of Health for Prevenar remained.  Accordingly, under the clear and unambiguous terms of the Distribution Agreement, Wyeth could not terminate the Distribution Agreement without cause as long as the Ministry of Health continued to purchase Prevenar or had any outstanding orders under the MoH Agreement.

6.      In 2012, Neopharm was able to procure a multi-year extension of the MoH Agreement, thereby re-securing exclusive supply certainty with respect to Prevenar.  At Neopharm's insistence, prior to the execution of the extension agreement, Wyeth expressly confirmed that the suspension of Wyeth's termination rights under the Distribution Agreement that had been agreed upon in connection with the original MoH Agreement would continue to be in effect through this additional extension period.

2

7.      On May 1, 2014, despite the fact that the MoH Agreement continued to be in full force and effect and in direct contravention of the express terms of the Distribution Agreement, Wyeth sent Neopharm a letter purporting to terminate the Distribution Agreement without cause and effective immediately.

8.      As set forth in detail below, Wyeth's conduct in terminating Neopharm as its exclusive distributor in Israel constitutes a blatant violation of the clear and unambiguous terms of the Distribution Agreement.  Neopharm therefore brings this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, seeking a declaration that Wyeth's termination of the Distribution Agreement was unlawful.

## PARTIES

9.      Plaintiff Neopharm is an Israeli corporation with its principal place of business located at 6 Hashiloach Street, in Petach-Tiqva, Israel.

10.     Plaintiff Promedico is an Israeli corporation with its principal place of business located at Emek-Heffer Industrial Zone, Israel.  Promedico is a wholly owned subsidiary of Neopharm and part of the Neopharm Group of companies.

11.     Upon information and belief, Defendant Wyeth is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York, 10017.  Upon information and belief, Wyeth was formerly known as Wyeth-Ayerst International Inc., a New York corporation.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(2).  The amount in controversy exceeds $75,000.

3

13.     Venue is proper in this district pursuant to Section 9.8 of the Distribution

Agreement, in which the parties agreed that any disputes arising under or in connection with the

Distribution Agreement shall be adjudicated by a court sitting in New York, New York.

## GENERAL ALLEGATIONS

### History of the Parties' Relationship and the Distribution Agreement

14.     The business relationship between the parties extends back to 1941, when Dr.

Leopold Goldschmidt, a pediatrician by profession, was appointed by Wyeth's predecessor,

Lederle Laboratories, to serve as its representative in the territory that currently includes Israel

and certain neighboring countries.  Dr. Goldschmidt's partnership with Lederle Laboratories

enabled the company to bring its portfolio of important antibiotics, antitoxins and vaccines to the

people of this region.

15.     In 1955, Dr. Goldschmidt and his son-in-law, Zvi Sarel, established Neopharm to

assume the right to distribute Lederle Laboratories' products in Israel.  Over the course of the

parties' decades-long relationship, Neopharm and Lederle Laboratories and its successors –

American Cynamid Company, American Home Products, and ultimately Wyeth – have entered

into numerous contracts for the marketing and distribution of important healthcare and

pharmaceutical products in Israel.  Most recently, Neopharm and Wyeth entered into the

Distribution Agreement, which became effective on October 1, 2002.  A true and correct copy of

the Distribution Agreement is attached hereto as Exhibit A.

16.     Pursuant to the Distribution Agreement, Neopharm was appointed the exclusive

distributor in Israel for various Wyeth pharmaceutical products.  Among the products covered by

the Distribution Agreement was Prevenar, a unique and potentially life-saving vaccine against

pneumococcus bacteria for infants and young children.  Pneumococcus bacteria causes many

4

types of serious infections in individuals of all ages and is the primary cause of pneumonia and meningitis in children, rendering it one of the leading causes of vaccine-preventable infant deaths in the world.

17.     The Distribution Agreement does not provide for a set term, but rather it continues in effect indefinitely unless properly terminated in accordance with the Distribution Agreement's terms.  Article 7 of the Distribution Agreement addresses the parties' termination rights.  Section 7.1 of the Distribution Agreement, which was amended on or about May 14, 2008 ("May 2008 Amendment," attached hereto as Exhibit B), provides the parties with a "Notice of Termination" right and states (in relevant part):

> **"Unless terminated as provided in Section 7.2 below or by mutual written consent, this Agreement shall continue in full force and effect for an indefinite period provided that: (a) either party may terminate this Agreement at any time, with or without cause, and without the need to provide the reasons for such termination by giving three (3) years' prior written notice of termination** whereupon this Agreement shall terminate at the conclusion of such three-year period following the date of the notice of termination . . . ."  (emphasis added).

Section 7.2, in turn, allows the parties to terminate for cause in certain discrete circumstances, such as upon an uncured material breach of the Distribution Agreement or the bankruptcy of a party.

18.     As is evident by the plain language of the quotation above, the Distribution Agreement's express terms make clear that Section 7.1 and Section 7.2 provide the only two means by which Wyeth may unilaterally terminate the Distribution Agreement.  In the event that termination under one of these two sections is not available, Section 7.1 makes clear that the Distribution Agreement "shall continue in full force and effect" unless both parties agree "by mutual written consent" to terminate.

5

19.     Section 7.1 of the Distribution Agreement, by its express terms, sets forth a "Notice of Termination" right that permits Wyeth to provide "three (3) years' prior written notice of termination," in which case the Distribution Agreement is deemed terminated at the conclusion of the three-year period.  Rather than wait out the entire three-year notice period required under Section 7.1, however, Section 7.5(b) (as amended by the May 2008 Amendment) provides Wyeth with the option of curtailing this period by making a single payment:

> "The Company shall be entitled, in its sole discretion, to pay the Distributor in lieu of providing notice under Section 7.1, such payment calculated as (i) the average of yearly net FAS sales by the Company of the Products to the Distributor or to agencies of the Israeli Government over the three years' prior to the date of notice (or, if a particular Product has been sold for less than three years in the Territory, the period of time sold with respect to such Product and three years with respect to other Products) multiplied by (ii) 13.5% (for FAS sales by the Company of the Products to the Distributor) or 7% (for sales to agencies of the Israeli Government) multiplied by (iii) a fraction, the numerator of which shall equal the number of months to be paid in lieu of notice and the denominator of which shall equal twelve."

As the introductory language to Section 7.1 makes clear, Section 7.5(b) does not provide an independent termination right under the Distribution Agreement, as – by its express terms – the only termination rights available under the Distribution Agreement are set forth in Section 7.1 and Section 7.2.  Instead, assuming Wyeth can properly invoke its Notice of Termination right under Section 7.1, Section 7.5(b) merely provides Wyeth with the alternative option of paying a single, calculated dollar amount, rather than having to operate under the Distribution Agreement during the full three-year notice period set forth in Section 7.1.

**Neopharm Consummates an Agreement with the Israeli Ministry of Health for the Supply of Prevenar**

20.     In 2008, Wyeth authorized Neopharm to approach the Israeli Ministry of Health regarding the potential inclusion of Prevenar in Israel's NIP.  The inclusion of Prevenar in

Israel's NIP represented a significant and recurring business opportunity for Wyeth in Israel. More than that, however, the inclusion of Prevenar in Israel's NIP was important to Wyeth's plans for the sale of Prevenar throughout the world. Professor Ron Dagan, a renowned Israeli scientist, was deeply involved in the development of Prevenar and had been an influential advocate for the use of Prevenar over a competing pneumococcal vaccine worldwide. It was thus important to Wyeth's overall plans for Prevenar that Professor Dagan's own home country of Israel include Prevenar in its NIP.

21.    Over the course of more than a year, Neopharm engaged in extensive and complex negotiations regarding the potential inclusion of Prevenar in Israel's NIP. These negotiations involved both the Ministry of Health and Israel's Ministry of Finance, as inclusion of Prevenar in the NIP required allocation of an unusually large budget for vaccine purchases. Despite these challenges, Neopharm ultimately succeeded in securing the required budget and thereafter an agreement from the Ministry of Health for inclusion of Prevenar in Israel's NIP.

22.    On or about April 5, 2009, Promedico (a wholly-owned subsidiary of Neopharm) and the Ministry of Health entered into the MoH Agreement, which provided for the exclusive supply of Prevenar to the Ministry for at least three years (and possibly longer). True and correct copies of the executed Hebrew version of the MoH Agreement and the English translation of the MoH Agreement transmitted to Wyeth on or about April 6, 2009 are attached hereto as Exhibit C.

23.    Pursuant to the MoH Agreement, Promedico agreed to supply the Ministry of Health with Prevenar in sufficient quantities to enable the Ministry to implement a continuous vaccination routine for Israeli infants under the NIP. In this regard, in accordance with an established Annual Order and Delivery Program, the Ministry agreed to order from Promedico a

guaranteed minimum quantity of Prevenar doses for delivery each year during the term of the MoH Agreement.  The term of the MoH Agreement extended until June 30, 2012, though the Ministry retained the option to renew the agreement for an additional period of two years (i.e., until June 30, 2014).

### Amendment of the Distribution Agreement Following Execution of the MoH Agreement

24.     Soon after the execution of the MoH agreement, on or about June 11, 2009, Neopharm and Wyeth executed an amendment to the Distribution Agreement "in order to enable and facilitate" the supply of Prevenar to the Ministry of Health in accordance with the MoH Agreement (the "June 2009 Amendment").  A true and correct copy of the June 2009 Amendment is attached hereto as Exhibit D.

25.     Section 3.2 of the June 2009 Amendment provided that Neopharm would receive a commission equal to 7% of the net sales of each dose of Prevenar sold under the MoH Agreement.  This 7% commission was significantly lower than both the margin that had been earned by Neopharm for Prevenar prior to the June 2009 Amendment and the margin that Neopharm continued to earn for other products similarly purchased and resold under the Distribution Agreement.

26.     Section 3.4 of the June 2009 Amendment addressed the parties' Notice of Termination right under the Distribution Agreement, stating:

> "The following sentence will be added **at the end of Section 7.1 of the Original Agreement**: 'Notwithstanding the foregoing, **no such prior written notice of termination shall be provided during the later of: (i) the entire period during which the MoH Agreement will be in full force and effect (including any extension thereto) or (ii) the period in which orders under the MoH Agreement are outstanding.**" (emphasis added).

8

27.     Section 3.4 of the June 2009 Amendment clearly and unambiguously alters Section 7.1 of the Distribution Agreement to provide that the Notice of Termination right set forth in Section 7.1 cannot be invoked until the MoH Agreement (including any extension thereto) is no longer "in full force and effect" and there are no more outstanding orders for Prevenar under the MoH Agreement.  As such, Section 3.4 of the June 2009 Amendment provided Neopharm with assurance that Wyeth could not terminate the Distribution Agreement without cause as long as the Ministry of Health continued to order Prevenar under the MoH Agreement.

28.     The parties' agreement to suspend Wyeth's Notice of Termination right under Section 7.1 of the Distribution Agreement as long as the Ministry of Health continued to solicit orders under the MoH Agreement is also reflected in Section 3.1 of the June 2009 Amendment, which states:

> "Notwithstanding any other provision in the Original Agreement, during the later of: (i) the entire period during which the MoH Agreement will be in full force and effect (including any extension thereto) or (ii) the period in which orders under the MoH Agreement are outstanding, the orders, delivery, prices, payment terms, and expiration dates with respect to the Vaccines shall be as follows . . . ."

Section 3.1, which sets forth details concerning the terms applicable to sales to the Ministry in accordance with the MoH Agreement, further confirms Wyeth's obligation to supply the Prevenar vaccine to Neopharm as long as the Ministry of Health continues to order such vaccines pursuant to the MoH Agreement.

**Ministry of Health's Request for Additional Product and the Further Amendment of the Distribution Agreement**

29.     On August 5, 2009, the Ministry of Health issued a letter to Promedico requesting to increase the amount of Prevenar doses to be ordered for 2009 ("August 2009 MoH Letter").

The Ministry of Health also advised that it might seek to further increase the amount of Prevenar doses ordered for supply during the entire term of the MoH Agreement, including the renewal period (which operated to extend the MoH Agreement through June 2014). In order to accommodate these anticipated changes, the Ministry proposed an arrangement whereby all of the terms of the MoH Agreement would be deemed valid and binding with respect to (a) any additional doses that may be ordered by the Ministry during the term of the MoH Agreement (including the renewal period) above and beyond those set forth in the Annual Order and Delivery Program, and (b) any additional Prevenar doses ordered by the Ministry from time to time after the end of the MoH Agreement. True and correct copies of the Hebrew version of the August 2009 MoH Letter and the English translation of the August 2009 MoH Letter transmitted to Wyeth on or about August 7, 2009 are attached hereto as Exhibit E.

30.     The August 2009 MoH Letter was agreed to and approved by both Promedico and Wyeth.

31.     On October 2, 2009, Wyeth and Neopharm amended the Distribution Agreement to account for the August 2009 MoH Letter (the "October 2009 Amendment"). A true and correct copy of the October 2009 Amendment is attached hereto as Exhibit F.

32.     Among other things, the October 2009 Amendment revised the definition of "MoH Agreement" as set forth in the June 2009 Amendment to include the August 2009 MoH Letter. In addition, and consistent with the August 2009 MoH Letter, the October 2009 Amendment confirmed that the provisions of the Distribution Agreement (as amended) would apply with respect to (a) any additional Prevenar doses that may be ordered by the Ministry of Health during the term of the MoH Agreement (including the renewal period) above and beyond

those set forth in the Annual Order and Delivery Program, and (b) any additional doses ordered by the Ministry from time to time after the end of the MoH Agreement.

**Pfizer Acquires Wyeth and Attempts to Rewrite the June 2009 Amendment**

33.    In or around January 26, 2009, Pfizer Inc. ("Pfizer") agreed to acquire Wyeth in a deal reported to be worth nearly seventy billion dollars.  At the time of the acquisition, Pfizer already had its own distribution network in Israel through its subsidiary, Pfizer Pharmaceuticals Israel, Ltd. ("Pfizer Israel").  Pfizer Israel had access to the entire portfolio of Pfizer products, a substantial portion of which it was already selling in Israel.  Pfizer Israel also had established regulatory, marketing, sales and commercial capabilities throughout Israel and had contracted with a third party for logistics and services.  As stated in Pfizer's public filings with the U.S. Securities and Exchange Commission, one of the key business considerations underlying Pfizer's decision to purchase Wyeth was the significant operational synergies that would result from the merger of Wyeth's and Pfizer's worldwide commercial and distribution channels.

34.    Upon information and belief, shortly before its acquisition of Wyeth was expected to close, Pfizer learned of the June 2009 Amendment to the Distribution Agreement and expressed concern over the impact of that amendment on Wyeth's right to terminate the Distribution Agreement without cause.  Nonetheless, on October 15, 2009, Pfizer closed its acquisition of Wyeth, which continued to operate and exist as a wholly-owned subsidiary of Pfizer.

35.    Subsequently, on November 4, 2009, Shebli Aghabi, Wyeth's Area Director for the Middle East and North Africa, sent a letter to David Fuhrer, Chief Executive Officer of Neopharm, in which Mr. Aghabi took the position that the amendment to Section 7.1 of the Distribution Agreement reflected in Section 3.4 of the June 2009 Amendment was intended to

11

apply to Prevenar only, and not to any of the other products distributed by Neopharm under the Distribution Agreement.  In other words, Mr. Aghabi conceded that Section 3.4 of the June 2009 Amendment suspended Wyeth's Notice of Termination right under the Distribution Agreement, but posited that the suspension applied to Prevenar only, despite the lack of any reference to Prevenar in Section 3.4.  In taking this position, Mr. Aghabi acknowledged that the June 2009 Amendment to Section 7.1 was intended "to ensure the ability of Neopharm to supply the Prevenar vaccine to the MoH **during the whole term of the agreement between Promedico and the MoH . . . .**" (emphasis added).

36.     In response, Mr. Fuhrer agreed that the June 2009 Amendment suspending Wyeth's right to invoke the Notice of Termination right under Section 7.1 of the Distribution Agreement was prompted by the MoH Agreement and "the necessity to build certainty. . . during the entire term of that agreement."  But Mr. Fuhrer disagreed that the amendment to Section 7.1 was somehow limited to Prevenar only, writing:  "The amendment to Section 7.1 of the 2002 [Distribution] Agreement did not say that it would now be possible to split the 2002 [Distribution] Agreement into pieces and terminate part while it would continue for sales to the MOH as this was not the intention of the amendment or the agreement of the parties."

**Extension of the MoH Agreement**

37.     By its terms, the MoH Agreement was set to expire on June 30, 2012, unless the Ministry of Health elected to extend the agreement for an additional two years up to and including June 30, 2014.  Expiration of the MoH Agreement would require the Ministry to initiate a bidding process, which could result in the substitution of Prevenar in the NIP with a competing pneumococcus vaccine.

12

38.     In early 2012, Neopharm – again, acting with the authorization of Wyeth – began discussions with the Ministry of Health regarding the exercise of the Ministry's extension rights under the MoH Agreement.  During the course of these discussions, the prospect of a four year (rather than a two year) extension of the MoH Agreement – through and including June 30, 2016 – was raised.

39.     Ultimately, the Ministry of Health indicated that it was amenable to a four-year extension of the MoH Agreement, provided that the Ministry would retain the option to end the term one year earlier (i.e., on June 30, 2015).  The option to reduce the extended term from four years to three enabled the Ministry of Health to maintain flexibility to initiate a competitive bidding process given the potential for viable alternatives to Prevenar.

40.     In advance of consummating an agreement with the Ministry of Health, Neopharm demanded that Wyeth confirm in writing that (a) Wyeth approved the terms presented by the Ministry of Health to secure the four year extension, and (b) such an extension will be deemed an extension of the MoH Agreement for the purposes of the Distribution Agreement including, in particular, Section 3.4 of the June 2009 Amendment.  On February 27, 2012, Wyeth provided the requested assurances, writing:

> "[W]e confirm that the term between July 1, 2012 and June 30, 2016 (or June 30, 2015, as the case may be) **shall be deemed to be an extension of the MoH Agreement for the purpose of the Distribution Agreement, including without limitation with respect to Section 3.4 appearing in the Amendment dated June 11, 2009**." (emphasis added).

In other words, Wyeth confirmed in writing that the suspension of Wyeth's Notice of Termination right reflected in Section 3.4 of the June 2009 Amendment would continue to apply until the later of the expiration of the extended term of the MoH Agreement or the period in

which there were no orders under the MoH Agreement outstanding.  A true and correct copy of Wyeth's February 27, 2012 letter is attached hereto as Exhibit G.

41.      With Wyeth's written assurances in hand, on or about May 22, 2012, Promedico and the Ministry of Health entered into a written agreement to extend the MoH Agreement (the "MoH Extension").  True and correct copies of the executed Hebrew version of the MoH Extension and the English translation of the MoH Extension transmitted to Wyeth on or about May 22, 2012 are attached hereto as Exhibit H.

42.      Consistent with the parties' discussions, Section 1 of the MoH Extension extended the term of the MoH Agreement for four years, from July 1, 2012 until June 30, 2016. Section 2 of the MoH Extension set forth the minimum number of doses that the Ministry of Health committed to order from Promedico during each year of the extended term.  In addition to those paid doses, Section 3 of the MoH Extension provided that a certain number of doses would be provided to the Ministry each year free of charge.

43.      While the MoH Extension operated to extend the term of the MoH Agreement for four years beyond the initial term, pursuant to Section 5 of the MoH Extension, the Ministry of Health had an option to cause the extended term to expire one year early, on June 30, 2015 (the "early termination option").  The Ministry of Health was required to advise Promedico whether it intended to exercise this early termination option no later than December 31, 2014.

44.      In addition to extending the term of the MoH Agreement through June 30, 2016, the MoH Extension (Section 6) provided that the MoH Agreement would continue to apply and bind the parties with respect to Prevenar doses ordered by the Ministry from time to time and in its sole discretion after the expiration of the MoH Agreement, provided that Promedico (at Wyeth's direction) shall be entitled to notify the Ministry of Health of the cancellation of Section

14

6 upon one year's notice at any time beginning three months prior to the expiration of the

extended term of the MoH Agreement.  In other words, Section 6 of the MoH Extension

expressly permitted the Ministry of Health to continue to order Prevenar even after the extended

term of the MoH Agreement expired, unless and until Wyeth instructed Promedico to provide the

requisite one year's notice that new orders would no longer be accepted – which notice could not

be provided before April 1, 2016 (i.e., Wyeth could not cause the Ministry of Health to cease

placing orders in accordance with the MoH Agreement prior to March 31, 2017).

45.     With the MoH Extension in place, Wyeth continued to supply Prevenar to

Neopharm for use by the Ministry of Health in accordance with the terms of the MoH Extension.

**Wyeth Unlawfully Terminates the Distribution Agreement**

46.     As discussed in detail above, the Distribution Agreement clearly and

unambiguously provided that Wyeth could not under any circumstances issue a Notice of

Termination to Neopharm under Section 7.1 until the later of (a) the expiration of the extended

term of the MoH Agreement, or (b) the point at which there were no outstanding orders under the

MoH Agreement.  Specifically, Section 3.4 of the June 2009 Amendment, which was reaffirmed

by Wyeth when the MoH Extension was entered into in May 2012, provided that Wyeth could

not avail itself of its Notice of Termination right under Section 7.1 of the Distribution Agreement

as long as the Ministry of Health continued to solicit orders for Prevenar in accordance with the

MoH Agreement – something that would continue until at least June 30, 2016 (unless the

Ministry elected to invoke the early termination option, in which case it would continue at least

until June 30, 2015).  With Wyeth's Notice of Termination right under Section 7.1 suspended,

Wyeth could not invoke its wholly derivative right under Section 7.5(b) of the Distribution

15

Agreement to make a calculated payment "in lieu" of continuing to operate under the Distribution Agreement during the full three-year notice period required under Section 7.1.

47.     Despite the explicit terms of the Distribution Agreement stating it can only be terminated in accordance with Section 7.1 or Section 7.2, and the unavailability of the payment "in lieu" of notice option set forth in Section 7.5(b) because the Section 7.1 Notice of Termination right remained suspended, on May 1, 2014, Miron Livneh, Pfizer Israel's Country Manager, sent a letter to Neopharm on behalf of Wyeth purporting to terminate the Distribution Agreement pursuant to Section 7.5(b), effective immediately (the "Termination Notice"). A true and correct copy of the Termination Notice is attached hereto as Exhibit I.

48.     The Termination Notice advised Neopharm that "payment in lieu of Section 7.1 notice (the 'Payment in lieu of Notice') has been transmitted to Neopharm" and instructed Neopharm that, "[u]pon the transfer of all [relevant] registrations to Wyeth, Neopharm shall immediately cease all sales and other activities on behalf of Wyeth." The Termination Notice makes clear that, in terminating Neopharm, Wyeth was relying on Section 7.5(b) alone. Wyeth did not assert or otherwise suggest that it was attempting to terminate the Distribution Agreement under any other provision, including Section 7.2 (which permits termination for cause).

49.     On May 5, 2014, David Fuhrer wrote to Mr. Livneh, expressing shock at Wyeth's unlawful termination, which contravenes the clear language of the Distribution Agreement as well as the parties' repeated acknowledgements that the Distribution Agreement could not be terminated without cause while the MoH Agreement remained in effect and while the Ministry of Health continued to purchase Prevenar pursuant to the MoH Agreement – both of which were ongoing at the time of Wyeth's Termination Notice.

50.     Although Wyeth's conduct is plainly prohibited by the clear and unambiguous terms of the Distribution Agreement, the motivation behind this conduct is clear:  Having been acquired by Pfizer, Wyeth is looking to utilize Pfizer's own established marketing, sales and distribution network in Israel with respect to the products covered by the Distribution Agreement and to cut out Neopharm.  With the extension of the MoH Agreement firmly in place, and with all potential competition to Prevenar posed by other pneumococcus vaccines having recently evaporated (the Ministry of Health found one competitor's product to be clinically inferior to Prevenar and development of another competitor's product was substantially delayed due to unsuccessful clinical trials), Wyeth finally decided to pull the plug on its distribution relationship with Neopharm – even though doing so was unlawful.

51.     In significant part to avoid any disruption in the supply of Prevenar and other important medications to the people of Israel, Neopharm – acceding to Wyeth's demand – transferred the necessary registrations and permitted Pfizer Israel to take over distribution of products covered by the Distribution Agreement.  The parties, however, continued to correspond regarding their respective positions concerning the lawfulness of Wyeth's actions.  Throughout the correspondence, Neopharm has continued to maintain that the termination was in direct contravention of the clear and unambiguous terms of the Distribution Agreement, while Wyeth refuses to acknowledge the unlawfulness of its conduct.

## CLAIM FOR RELIEF

### (Declaratory Judgment Against Defendant Wyeth)

52.     Neopharm incorporates the allegations made in paragraphs 1 through 51 above as though fully set forth herein.

17

53.     Section 7.1, as amended by the May 2008 Amendment, provides that: "Unless terminated as provided in Section 7.2 below or by mutual written consent, this Agreement shall continue in full force and effect for an indefinite period provided that: (a) either party may terminate this Agreement at any time, with or without cause, and without the need to provide the reasons for such termination by giving three (3) years' prior written notice of termination whereupon this Agreement shall terminate at the conclusion of such three-year period following the date of the notice of termination." Section 7.2 allows the parties to terminate for cause in certain discrete circumstances, such as an uncured material breach of the Distribution Agreement or bankruptcy of a party. Accordingly, by its plain language, Section 7.1 makes clear that the only termination rights available under the Distribution Agreement are set forth in Section 7.1 (Notice of Termination) and Section 7.2 (termination for cause).

54.     Section 3.4 of the June 2009 Amendment clearly and unambiguously suspended Wyeth's Notice of Termination right under Section 7.1 until "the later of (i) the entire period during which the MoH Agreement will be in full force and effect (including any extension thereto) or (ii) the period in which orders under the MoH Agreement are outstanding." At the time that Wyeth issued its Termination Notice, the MoH Agreement was still "in full force and effect," such that Wyeth's right to issue a Notice of Termination under Section 7.1 continued to be suspended. Moreover, Wyeth did not have the right and did not seek to terminate for cause pursuant to Section 7.2 of the Distribution Agreement, since none of the discrete circumstances set forth in that section had occurred.

55.     Contrary to Wyeth's assertions as set forth in the Termination Notice and subsequent correspondence with Neopharm, Section 7.5(b) of the Distribution Agreement does not provide an independent basis to terminate the Agreement. Instead, Section 7.5(b) – which

18

states that Wyeth may "pay [Neopharm] in lieu of providing notice under Section 7.1" – merely provides Wyeth the option of making a calculated payment rather than continuing the Distribution Agreement for the entire notice period required by Section 7.1.  The rights set forth in Section 7.5(b) are completely derivative of the Notice of Termination right established in Section 7.1 of the Distribution Agreement; as long as the Notice of Termination right under Section 7.1 remained suspended, Wyeth could not opt to make payment "in lieu of providing notice under Section 7.1" as provided for under Section 7.5(b).

56.      Since the Termination Notice was issued, Wyeth continues to maintain that it had the right to invoke Section 7.5(b), while Neopharm continues to assert that Wyeth's Notice of Termination right under Section 7.1 – and therefore its derivative rights under Section 7.5(b) – were suspended and thus could not be exercised.  Accordingly, an actual and present controversy exists as to whether Wyeth's termination of the Distribution Agreement was lawful.

57.      Wyeth's unlawful termination of the Distribution Agreement has caused and continues to cause substantial monetary and reputational harm to Neopharm and its affiliates (including Promedico and Neopharm Israel).

58.      Pursuant to 28 U.S.C. §§ 2201-2202, Neopharm therefore requests a declaratory judgment by this Court that Wyeth was not permitted to terminate the Distribution Agreement pursuant to Section 7.1 or otherwise invoke Section 7.5(b).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that, pursuant to 28 U.S.C. §§ 2201-2202, this Court enter a judgment declaring that (1)Wyeth had no right to terminate the Distribution Agreement pursuant to Section 7.1 or to otherwise invoke Section 7.5(b) of the Distribution Agreement, and (2) as a result, Wyeth's termination of the Distribution Agreement was unlawful.

Dated:  October 14, 2014
        New York, New York

                              WILSON SONSINI GOODRICH & ROSATI
                              Professional Corporation

                              _____

                              Michael S. Sommer
                              Jessica L. Margolis
                              Sheryl Shapiro Bassin
                              1301 Avenue of the Americas, 40th Floor
                              New York, New York 10019
                              Telephone:  (212) 999-5800
                              Facsimile:  (212) 999-5899

                              and

                              Lawrence I. Fox, Esq.
                              250 West 82nd Street
                              New York, New York 10024
                              Telephone:  (917) 620-2778

                              *Co-Counsel for Plaintiffs Neopharm Ltd. and
                              Promedico Ltd.*