UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEOPHARM LTD. AND PROMEDICO LTD.,<br><br>               Plaintiffs,<br><br>    -against-<br><br>WYETH-AYERST INTERNATIONAL LLC,<br><br>               Defendant. | 14-Cv-8192 (SHS)<br><br><u>OPINION & ORDER</u> |

SIDNEY H. STEIN, U.S. District Judge.

This declaratory judgment action arises out of a longstanding business relationship that, once healthy, now lies infirm. Neopharm Ltd.—and its wholly owned subsidiary Promedico Ltd.—is an Israeli pharmaceutical distributor that contracted to distribute medical products that defendant Wyeth-Ayerst International LLC manufactured. Neopharm had served as Wyeth's distributor in Israel for nearly 70 years, but in 2014, over Neopharm's objection, Wyeth unilaterally terminated their Distribution Agreement ("Distribution Agreement" or "Agreement").

Neopharm and Wyeth have each now moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) to establish whether the Distribution Agreement permitted Wyeth to unilaterally terminate it without cause in May 2014. Neopharm also moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Wyeth's counterclaim that Wyeth was alternatively allowed to terminate the Agreement for cause. For the reasons that follow, the Court grants Neopharm's motion for judgment on the pleadings, denies Wyeth's cross-motion for judgment on the pleadings, and grants Neopharm's motion to dismiss Wyeth's counterclaim.

## I.  BACKGROUND

Wyeth manufactures products such as medicine and vaccines. (Compl. ¶¶ 1-2; Answer ¶¶ 1-2.) For nearly 70 years, Neopharm distributed Wyeth's products in Israel, including Prevenar, an important vaccine which immunizes infants and young children against life-threatening

pneumococcal disease and meningitis. (Compl. ¶¶ 1-2; Answer ¶¶ 1-2.) The parties' relationship has been governed by several contracts, but the most important for our purposes is the Distribution Agreement signed on October 1, 2002, and its subsequent amendments. (*See* Compl. Ex. A.)

In 2008, Neopharm—with Wyeth's blessing, (Compl. ¶ 20; Answer ¶ 20)—approached the Israeli Ministry of Health to negotiate an agreement to include Prevenar in Israel's National Immunization Program. (Compl. ¶ 3; Answer ¶ 3.) Neopharm's negotiations were successful, and, in April 2009, Neopharm signed an agreement with the ministry to supply Prevenar to it for administration to every Israeli newborn as the sole vaccine to be administered against pneumococcal disease. (Compl. ¶ 3; Answer ¶ 3.)

Approximately two months later, Neopharm and Wyeth amended their Distribution Agreement. (Compl. Ex. D.) Most relevant here is the amendment to the contract's termination provision in section 7.1. Prior to June 2009, section 7.1 had allowed either party to terminate the contract without cause upon issuance of three years' notice. (Compl. Ex. A § 7.1; Compl. Ex. B § 3.3.) The June 2009 amendment changed that and prohibited the parties from issuing the three years' notice until all business with the ministry had concluded, including any period "in which orders under the [Ministry of Health] Agreement are outstanding." (Compl. Ex. D § 3.4.)

The ministry deal was not slated to expire until June 2015 at the earliest. (Compl. ¶ 40; Answer ¶ 40.) On May 1, 2014—while the Agreement was still in effect—Wyeth sent Neopharm a letter terminating the Agreement. (Compl. ¶ 7; Answer ¶ 7.) Wyeth did not invoke the three-year notice provision in section 7.1 and instead invoked section 7.5(b). That section allowed Wyeth, it claimed, to terminate the contract without giving *any* notice as long as Wyeth paid Neopharm $28,768,400, which Wyeth transmitted to Neopharm on the same day as it sent the termination letter. (Compl. Ex. I.)

Shortly thereafter, Neopharm filed the complaint in this action, seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that section 7.5(b) of the distribution agreement did not authorize Wyeth's termination. (Compl. ¶ 55.) Wyeth answered the complaint, asserting both affirmative defenses and counterclaims. (Answer ¶¶ 59-134.) Relevant to this motion, Wyeth counterclaimed for declaratory relief on the grounds that its

2

termination was lawful pursuant to section 7.5(b) or, in the alternative, that its termination was lawful pursuant to one of the Agreement's for-cause termination provisions. (Compl. ¶¶ 102-11.; Ex. A § 7.2(f).)

## II.  DISCUSSION

### A.  Legal Standards

The standard governing Rule 12(b)(6) motions to dismiss claims for relief also governs Rule 12(c) motions for judgment on the pleadings. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). For both motions, the Court must accept the allegations contained in the pleadings as true and draw all reasonable inferences in the non-movant's favor. *Id.*; *Cassoli v. Amer. Med. & Life Ins. Co.*, No. 14-Cv-9379, 2015 WL 3490688 at *2 (S.D.N.Y. June 2, 2015). For a motion for judgment on the pleadings, the Court considers not only the pleadings but also the exhibits and documents attached to the pleadings or incorporated by reference. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)

The Court will grant a motion to dismiss a claim if a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court will grant a motion for judgment on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *VGC Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 340 (S.D.N.Y. 2008) (citation and internal quotation marks omitted). Judgment on the pleadings is particularly appropriate in a dispute regarding a breach of contract where the primary issue is determining the parties' legal rights and obligations. *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013)

### B.  The Amended Distribution Agreement Did Not Permit Wyeth to Unilaterally Terminate Without Cause.

The parties first ask the Court to award judgment on the pleadings on the ground that the Distribution Agreement did—or did not—authorize Wyeth to terminate the contract by paying money to Neopharm. (*See* Compl. Ex. A § 7.5(b).) New York law—which the parties agree governs the contract (Compl. Ex. A § 9.8)—requires the Court to determine whether the contract is "unambiguous" such that the Court may determine the parties'

rights and obligations as a matter of law. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). If the contract is unambiguous, the Court may award judgment on the pleadings, assuming no material facts are in dispute. If, however, the contract is ambiguous, the Court must examine extrinsic evidence of the parties' intent—which means, in this posture, that the Court would have to deny both cross-motions and proceed to discovery. *See id.*

A contract is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person . . . ." *Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (citation and internal quotation marks omitted); *Elbit Sys. Ltd. v. Credit Suisse Grp.*, 842 F. Supp. 2d 733, 739 (S.D.N.Y. 2012). By contrast, a contract is not ambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). The Court determines the contract's ambiguity by examining the contract's language in context and by drawing all reasonable inferences. *Alexander*, 136 F.3d at 86.

Notably, the Court may not find the contract ambiguous merely because the parties present alternative interpretations. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009); *Ga.-Pac. Consumer Prods., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008). The touchstone of New York's ambiguity standard is "reasonableness." *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569-70 (2002). Although the existence of two interpretations does not alone make a contract ambiguous, the existence of two *reasonable* interpretations does. *See Elbit*, 842 F. Supp. 2d at 739; *Cooperatieve Centrale Raiffersen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.*, No. 08-cv-9565, 2008 WL 5170178 at *10 (S.D.N.Y. Dec. 10, 2008).

At the time that Wyeth terminated the Distribution Agreement on May 1, 2014, (Compl. ¶ 7; Answer ¶ 7), the contract set forth several ways that the parties could terminate it. (Compl. Ex. A §§ 7.1, 7.2, 7.5, *as amended by* Ex. B §§ 3.3, 3.5 *and* Ex. D. § 3.4.) Section 7.1 of the Agreement as amended provides that:

> Unless terminated as provided in Section 7.2 below or by mutual
> written consent, this Agreement shall continue in full force and

> effect for an indefinite period provided that: . . . either party may terminate this Agreement at any time, with or without cause, and without the need to provide the reasons for such termination by giving three (3) years' prior written notice of termination whereupon this Agreement shall terminate at the conclusion of such three-year period following the date of the notice of termination.

(Compl. Ex. A § 7.1, *as amended by* Ex. B § 3.3.)

Section 7.1 thus recognizes three means of termination: (1) the for-cause termination provisions of section 7.2 which are irrelevant to these motions for judgment on the pleadings; (2) termination by mutual written consent which is irrelevant to this action; and (3) the provision permitting termination upon three years' written notice.

Wyeth contends that section 7.5(b) adds a fourth means of termination—payment. Section 7.5(b) provides that:

> [Wyeth] shall be entitled, in its sole discretion, to pay [Neopharm] in lieu of providing notice under Section 7.1, such payment calculated as (i) the average of yearly net FAS sales by [Wyeth] of the Products to [Neopharm] or to the agencies of the Israeli Government over three years' prior to the date of notice (or, if a particular Product has been sold for less than three years in the Territory, the period of time sold with respects to such Product and three years with respect to other Products) <u>multiplied</u> by (ii) 13.5% <u>multiplied</u> by (iii) a fraction, the numerator of which shall equal the number of months to be paid in lieu of notice and the denominator of which shall equal twelve.

(Compl. Ex. A § 7.5(b) (emphasis in original).)

Wyeth thus argues the section allows termination simply by paying the specified sum in lieu of three years' notice, which Wyeth has done. (Answer ¶ 60.)

But Wyeth's claim is not as straightforward as merely applying section 7.5(b). An amendment to section 7.1 that the parties agreed to in June 2009 complicates the analysis. After Neopharm completed its negotiations with the Israeli Ministry of Health, the parties amended the Distribution

Agreement expressly in order to "enable and facilitate the sales of the Vaccines to the [Ministry of Health] in accordance with the provisions of the [Ministry of Health] Agreement." (Compl. Ex. D at 1.) The amendment added a sentence to the end of the section such that section 7.1 now reads as follows:

> Unless terminated as provided in Section 7.2 below or by mutual written consent, this Agreement shall continue in full force and effect for an indefinite period provided that: . . . either party may terminate this Agreement at any time, with or without cause, and without the need to provide the reasons for such termination by giving three (3) years' prior written notice of termination whereupon this Agreement shall terminate at the conclusion of such three-year period following the date of the notice of termination. *Notwithstanding the foregoing, no such prior written notice of termination shall be provided during the later of: (i) the entire period during which the [Ministry of Health] Agreement will be in full force and effect (including any extension thereto) or (ii) the period in which all orders under the [Ministry of Health] Agreement are outstanding.*

(Compl. Ex. A § 7.1, *as amended by* Ex. B § 3.3, *as amended by* Ex. D § 3.4) (emphasis added).)

Neopharm and Wyeth agree that this June 2009 amendment prohibits the parties from invoking the three-year notice termination provision until after all business with the Ministry of Health has concluded. (Plfs.' Mem. of Law at 2, Dkt. No. 24; Def.'s Mem. of Law at 16, Dkt. No. 29.)

The parties disagree, however, about whether the amendment has any effect on section 7.5(b)'s termination-by-payment provision. That disagreement is the crux of the case. Neopharm contends, in essence, that section 7.5(b)'s payment option accelerates the three-year waiting period required under section 7.1. And—so the argument goes—if the June 2009 amendment prohibits Wyeth from terminating the Agreement with three years' notice until all business with the Ministry of Health has concluded, then Wyeth cannot pay Neopharm pursuant to section 7.5(b) in order to bypass section 7.1's three-year notice period. Wyeth responds that section 7.5(b) constitutes an independent means of termination and can be invoked regardless of whether or not the Ministry of Health agreement is in effect.

At the outset, the Court finds that section 7.1's plain language—when read in context and taking into account all reasonable inferences, *see Alexander*, 136 F.3d at 86—supports Neopharm. The section's language is emphatic. The Distribution Agreement continues in "*full* force and effect" and "for an *indefinite* period" "unless" section 7.2 is invoked for cause or the parties give mutual written consent. (Compl. Ex. A § 7.1, *as amended by* Ex. B § 3.3) (emphasis added).) Moreover, the contract continues unabatedly, "provided that" either party may terminate upon three years' written notice. Only these three expressly enumerated exceptions caveat the language regarding the contract's continued duration. That such language is so emphatic suggests that the three exceptions were written to be the exclusive means of terminating the Agreement.

But Wyeth urges that section 7.5(b) establishes a fourth, independent way to terminate the Agreement due to its language that Wyeth may pay Neopharm "*in lieu of* providing notice under section 7.1." (Compl. Ex. A section 7.5(b) (emphasis added).) "[I]n lieu of," says Wyeth, means "instead of" or "in place of" or "in substitution of." *Performance Connectivity v. Wimmers*, 2007 WL 7321656 (N.Y. Sup. Ct. 2007); Black's Law Dictionary 858 (9th ed. 2009). Consequently, section 7.5(b) must mean that payment is an independent alternative to the three years' notice under section 7.1, and suspension of rights under section 7.1 has no effect on the equal "substitute" means of termination by payment set forth in section 7.5(b).

Wyeth's reading—which rests entirely on the interpretation of the "in lieu of" clause—is not a "reasonable" interpretation of how section 7.5(b) works given the plain language of the contract as a whole and in context. *See Greenfield*, 98 N.Y.2d at 569-70 (noting that a contract is unambiguous when it "is *reasonably* susceptible of only one meaning" (emphasis added)). Section 7.5(b)'s termination by payment cannot serve as an independent means of termination without rewriting or rendering meaningless section 7.1. *See Ga.-Pac.*, 566 F. Supp. 2d at 251. Section 7.1 says that the contract continues "in full force and effect" "unless" the parties invoke section 7.2 for cause or mutually agree to terminate, "provided that" the parties may terminate upon three years' notice. Wyeth tells the Court to add another "unless" clause: the contract continues "in full force and effect" unless Wyeth pays the sum articulated in section 7.5(b). But section 7.1's language

is not so inviting—it does not allow for section 7.5(b)'s pay-to-terminate provision to serve as a fourth, co-equal means of termination.

Wyeth's interpretation of section 7.5(b) is also unreasonable when viewed in the context of the section's remaining 105 words which set forth the calculation of the termination payment. To calculate the amount due, Wyeth must multiply 13.5% with two numbers to be determined. First, the parties must average Wyeth's "yearly net FAS sales" to Neopharm "over the three years' prior to *the date of notice*." (Compl. Ex. A § 7.5(b) (emphasis added).) Second, the parties must calculate a fraction, the "denominator of which shall equal twelve," and the "numerator of which shall equal the number of months to be paid *in lieu of notice*." (Compl. Ex. A § 7.5(b) (emphasis added).) Notably, section 7.5(b) expressly ties these two numbers to a date of "notice." Neopharm argues "notice" refers to the notice of termination enunciated in section 7.1. (Pls.' Mem. of Law 17.) But Wyeth contends that "notice" referred to in the calculations refers to the date on which Wyeth notifies that it has invoked section 7.5(b)'s payment option. (Def.'s Mem. of Law 15.)

The Court agrees with Neopharm. Nowhere in section 7.5(b) does the provision suggest that Wyeth must give a specific notice of payment in order to invoke the pay-to-terminate option. Indeed, section 7.5(b)'s opening clause—that payment will be made "in lieu of providing *notice under Section 7.1*"—expressly suggests that any mention of "notice" to come refers to that set forth in section 7.1.

Similarly, section 7.5(b)'s third use of the word "notice," which pegs the fraction's numerator to the "number of months to be paid in lieu of notice" strongly suggests—nay, states—that that numerator may only be calculated once the three-year notice of termination period has begun.  Indeed, section 7.5(b) itself does not specify a time period, so reading "the number of months to be paid in lieu of notice [made pursuant to section 7.5(b)]" makes no sense.  Clearly the numerator refers to the "number of months to be paid in lieu of notice" made pursuant to section 7.1. Thus, the Court finds unambiguous that the calculation of the payment in section 7.5(b) is based on the issuance date of section 7.1's three years' written notice of termination.

Wyeth goes on to contend that interpreting section 7.5(b)'s payment termination procedure to be contingent upon the existence of section 7.1's three-year notice provision is illogical and commercially unreasonable in two ways. (Def.'s Mem. of Law 15-16.) First, Wyeth attacks the prior-sales calculation as interpreted above on the basis that it "makes more sense" to calculate the prior three years' average sales starting from the date of payment instead of the date of section 7.1 notice. (Def.'s Mem. of Law 15-16.) Wyeth's argument is that calculating based on date of payment gives a more recent—and, in theory more accurate—average sales calculation.

But the contract does not instruct that the parties calculate three years' worth of average sales starting from a date of "payment." Rather, the contract starts the average sales calculation from the date of "notice." And contrary to Wyeth's protestations, such a calculation is not commercially unreasonable. Dating the prior three years' average sales from the date of payment might yield more *recent* results, but dating that average from the date of notice may provide more *representative* results. The date of notice may serve as the last day of normal distribution, since once notice is given, the parties begin winding up the Agreement. (*See* Compl. Ex. A §§ 7.3, 7.4, 7.5.) It is entirely reasonable that the parties would want to calculate average sales based on the most recent three years' worth of normalcy.

Second, Wyeth contends that the Court's conclusion that suspension of section 7.1's notice termination rights suspends section 7.5(b)'s payment termination rights is unreasonable because no manufacturer, "particularly in the highly regulated pharmaceutical industry," would agree to "cut off all means of unilaterally terminating a distributorship agreement." (Def.'s Mem. of Law at 17.) But the Court disagrees that a "suspension" of both section 7.1's notice-termination and section 7.5(b)'s payment-termination provisions would have left Wyeth so unprotected that the Court's interpretation must be unreasonable. For example, section 7.2, which has consistently been part of the contract, provides no less than six alternative means to terminate the Agreement all of which this Court has characterized as variations of "cause." (Compl. Ex. A § 7.2.) And four of those six protect *solely* Wyeth by giving Wyeth alone the ability to terminate the Agreement on certain conditions. (Compl. Ex. A § 7.2(c)-(f).) In addition, the parties were always able to terminate the Agreement by mutual written consent. (Compl. Ex. A § 7.1.)

Additionally, the Court does not find commercially unreasonable the suspension of all without-cause terminations as long as the parties were supplying vaccines to the Ministry of Health under the Agreement. The June 2009 Amendment expressly notes that its purpose is to "enable and facilitate" vaccine sales to the Israeli government. (Compl. Ex. D at 1.) The contract should thus be interpreted to ensure the stability that the document expressly notes the parties sought. *See Kass v. Kass*, 91 N.Y.2d 554, 567 (1998) ("Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." (alterations and internal quotation marks omitted)). As a result, it is neither illogical nor commercially unreasonable to read this Agreement as precluding any unilateral, without-cause termination during the period in which the ministry agreement remained in force.

The procedure the contract establishes for Wyeth to terminate pursuant to section 7.1—three years' notice—and section 7.5(b)—payment—therefore, is clear and unambiguous. First, Wyeth must issue a "written notice of termination." (Compl. Ex. § 7.1, *as amended by* Ex. B § 3.3.). Second, Wyeth faces a choice: it may wait three years to wind up the Distribution Agreement, (Compl. Ex. A § 7.1, *as amended by* Ex. B § 3.3), or it may accelerate the three-year period by paying Neopharm money pursuant to section 7.5(b). (Compl. Ex. A § 7.5(b).) The June 2009 amendment prohibited the parties from issuing the three years' notice pursuant to section 7.1 at least until June 2015, so section 7.1 notice was unavailable to Wyeth in May 2014 when it purported to terminate. (Compl. Ex. D § 3.4.) If section 7.1 notice was unavailable then, so too was section 7.5(b)'s payment option. Thus Wyeth's attempt to terminate Neopharm violated the Agreement.

### C.   Wyeth Fails to Allege Sufficient Facts to Show that it Could Terminate the Agreement for Cause Pursuant to Section 7.2(f).

Neopharm next moves to dismiss Wyeth's first counterclaim which seeks a declaratory judgment that termination was lawful pursuant to either section 7.5(b) or section 7.2(f) of the Distribution Agreement. (Answer ¶¶ 102-111; Pls.' Mem. of Law 25.) Given that the Court grants judgment on the pleadings to Neopharm on the grounds that Wyeth's termination was not permitted pursuant to section 7.5(b), the Court grants the motion to

dismiss that counterclaim to the extent it sought a declaratory judgment that the termination was lawful pursuant to section 7.5(b).

As to that part of Wyeth's first counterclaim that claims that the termination was lawful pursuant to section 7.2(f), that section as follows:

> This Agreement may be terminated at any time, by prior written notice to the other party . . . (f) By [Wyeth], effective immediately if [Neopharm] willfully makes any material false or untrue statements or representations to [Wyeth] herein or in the performance of its obligations hereunder.

(Compl. Ex. A § 7.2(f).)

The Court will look to Wyeth's Answer and Counterclaims and any documents appended or incorporated by reference in the light most favorable to Wyeth to determine if Wyeth states a "plausible" claim that section 7.2(f) permitted termination. *Twombly*, 550 U.S. at 570.

Wyeth's counterclaim is based on several statements that Neopharm's chairman David Fuhrer made regarding a drug called Xeljanz. (Answer ¶¶ 76-81.) Because the Distribution Agreement did not include Xeljanz, Fuhrer sought to add that drug to Neopharm's portfolio of drugs to distribute. (Answer ¶ 77.) The alleged false statements Fuhrer made came in an email thread with a Pfizer manager—Pfizer had by that time bought Wyeth (Compl. ¶ 33; Answer ¶ 33)—named Dr. Miron Livneh. (Ex. B. to Decl. of Jessica L. Margolis in Supp. of Plfs.' Mot., Dkt. No. 25.) Livneh started the exchange. He noted that during a meeting Fuhrer had threatened to torpedo Xeljanz's success in Israel unless Wyeth entrusted the drug's distribution to Neopharm. (*Id.* at 2-3.) Fuhrer responded by email on February 14, 2013, and claimed that any alleged "threats" were misunderstood. Because the parties each contend that the other side cherry-picks its quotations from Fuhrer's email, the Court quotes that email in full as follows:

> Dear Miron,
>
> I received your email below with some surprise, particularly in light of the excellent relationship existing between our companies and our mutual collaboration during 2012 which led to at least two significant unprecedented achievements, the [Ministry of Health

National Immunization Plan] prolongation agreement & Enbrel double digit growth.

The same applies to Xeljanz. I truly believe that, as I suggested to you and your managers, consolidated marketing & sales efforts for Enbrel & Xeljanz, will be beneficial as our economies of scale maximize profits for both parties and it would be a shame to waste the potential synergy that exists among the Pfizer chain of marketing including its distributors. I also agree to what I understood from you & your team that Enbrel sales growth should be "protected" during Xeljanz launch by executing smart strategies that will maximize Pfizer's profits from both products it owns. Once agreed we will of course verify the compliance of the agreement with all relevant regulations. Naturally, regardless of your decision on Xeljanz, please rest assured that Neopharm will give its best efforts to maximize the market share of any Pfizer product that we are entrusted to distribute.

I would like to emphasize in the clearest terms possible that the statements made by me during the meeting, to which you refer in your email below, were completely misunderstood. On the contrary, I noted that if we cooperate on this matter, I will do everything possible and make available any connections that I have, in order to advance the swift inclusion of Xeljanz in the NHB.

I hope that the message is clear and that a quick decision for collaboration will be taken to maximize both of our companies' success. The team and I are ready to make this happen.

Best regards,

David

(Margolis Decl. Ex. B at 1-2.)

Wyeth bases its argument that Neopharm made "material false or untrue statements . . . in the performance of its obligations [under the Distribution Agreement]" entirely on Fuhrer's email. (D's Br. at 18-22.) According to Wyeth, Fuhrer "assured" that Neopharm "would not take steps to interfere with the promotion of Xeljanz." (Answer ¶ 79.) And that assurance was

untrue because Neopharm subsequently engaged in a covert campaign to cripple Xeljanz in Israel. (Answer ¶ 80.).

But even crediting Wyeth's account of what occurred, *see Bank of N.Y.*, 607 F.3d at 922, the statements in the email do not satisfy the standard set forth in section 7.2(f).   First, nothing Fuhrer says constitutes a "material false or untrue statement." When Fuhrer states that Neopharm will work with Wyeth to promote Xeljanz, it is clear that his comments are conditional. He says "if we cooperate" then Neopharm "will do everything possible" to advance Xeljanz. (Ex. B to Margolis Decl. at 2.) He does not assure Wyeth that Neopharm will do all it can to advance Xeljanz whether or not the drug is incorporated into the Distribution Agreement.

And while he does pledge to use "smart strategies that will maximize profits from both products [Pfizer] owns," (Ex. B to Margolis Decl. at 2.), it is clear in the context of the email that Neopharm will seek to maximize profits for both drugs *only if* it wins the Xeljanz business. Fuhrer makes clear that if Xeljanz does not become a part of the Distribution Agreement, Neopharm will not take on the obligation of supporting that drug, and indeed, there is no reason apparent to the Court why Neopharm would or should expend effort and resources to promote a drug that was not part of its distribution network. Fuhrer concretely pledges only that Neopharm will maximize profits of already covered products such as Enbrel. In the end, Wyeth may not have liked Neopharm's means of doing that—Wyeth's allegation is that Neopharm sought to maximize the profits from Enbrel by torpedoing sales of Xeljanz (*see* Answer ¶ 80)—but that dissatisfaction does not render any of Fuhrer's statements materially false.

Equally fatal, even if the statements were materially false, Wyeth has failed to allege that any such false statements occurred "in the performance of" Neopharm's obligations under the Distribution Agreement. (Compl. Ex. A § 7.2(f).) It is undeniable that Fuhrer sent his email in the context of a pitch for new business: he wanted Neopharm to be able to distribute Xeljanz. (Ex. B to Margolis Decl. at 2) That fails to satisfy section 7.2(f). A pitch to bring a product into the corporate fold is not conduct that falls within the fold itself.

In one last attempt, Wyeth contends that Fuhrer made his false statements in the "performance of" Neopharm's obligations to distribute Enbrel. It is possible that if Fuhrer's statements about Enbrel had been false,

he would have lied during "performance of" his obligations pursuant to the Distribution Agreement. But, even crediting Wyeth's allegations to their fullest, Fuhrer did not lie about his plans to distribute Enbrel in the February 2013 pitch email. He states he will seek to maximize Enbrel's market share and profits, and—even according to Wyeth—that is what he tried to do. Wyeth certainly fails to state a "plausible" claim that any of Fuhrer's statements were sufficient to invoke section 7.2(f).

## III. CONCLUSION

The Distribution Agreement did not permit Wyeth to unilaterally terminate the Agreement without cause pursuant to section 7.5(b) or with cause pursuant to section 7.2(f). Consequently, the Court grants Neopharm's motion for judgment on the pleadings and declares that Wyeth violated the terms of the Distribution Agreement, as amended, when it purported to terminate that contract. The Court also denies Wyeth's cross-motion for judgment on the pleadings and grants Neopharm's motion to dismiss Wyeth's first counterclaim.

Dated:  New York, New York
        March 18, 2016

SO ORDERED:

Sidney H. Stein, U.S.D.J.

14